**The HARRISBURG AUTHORITY,
et al., Plaintiffs,**

v.

**CIT CAPITAL USA, INC.,
et al., Defendants.**

Civil No. 4:08–cv–0180.

United States District Court,
M.D. Pennsylvania.

June 14, 2010.

Ronald M. Katzman, Royce L. Morris, Steven E. Grubb, Goldberg, Katzman & Shipman, Charles B. Zwally, Mette, Evans & Woodside, Harrisburg, PA, Daniel Lawrence Sullivan, Saidis, Flower & Lindsay, Camp Hill, PA, for Plaintiffs.

Norman E. Greenspan, Stephanie C. Chomentowski, Blank Rome LLP, Philadelphia, PA, for Defendants.

## ORDER

JOHN E. JONES III, District Judge.

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is Plaintiff The Harrisburg Authority's ("THA") appeal from the July 14, 2009 discovery order issued by Magistrate Judge J. Andrew Smyser, (Doc. 78), which resolved THA's Motion to Compel, (Doc. 59). For the reasons that follow, we shall deny the appeal and affirm the Magistrate Judge's July 14, 2009 order.

### I. FACTUAL BACKGROUND [1]

The case *sub judice* involves THA's project to upgrade and modernize the Harrisburg Materials, Energy, Recycling and Recovery Facility, a trash-to-steam waste treatment facility ("the incinerator"). (Amend. Compl., ¶¶ 1, 10). To finance the incinerator project, THA issued a series of bonds. (*Id.* at ¶ 11). Dauphin County ("Dauphin"), in recognition of the county-wide benefits of the project and its responsibilities for municipal waste planning, entered into agreements with THA to guarantee some of the bonds. (*Id.* at ¶ 12).

THA contracted with Barlow Projects, Inc. ("Barlow") to design the incinerator, retrofit the facility, and provide state-of-the-art "Combustion Technology." (*Id.* at ¶¶ 14, 16.) The agreement between THA

---

1. As we explain below, the issues presently before us will require us to make a choice of law determination. Accordingly, and in aid of that analysis, the following factual recitation shall detail the relationships between the parties and the relevant causes of action at issue in this case.

and Barlow was memorialized in three separate contracts in May 2004. In the "Equipment Contract," THA agreed to pay almost $52 million for the proprietary and other specialized equipment necessary to retrofit the incinerator. (*See id.* at ¶ 18(I)). In the "Services Contract," THA agreed to pay almost $13 million to Barlow for engineering, construction, and start-up of the incinerator. (*See id.* at ¶ 18(II)). Finally, in the "Sublicensing Agreement," THA purchased a nonexclusive license to the use Barlow's proprietary Combustion Technology which was to be installed in the incinerator. (*See id.* at ¶ 18(III)).

The retrofit of the incinerator was originally scheduled to be completed in twenty-four months, and the facility was designed to be restarted in late 2005. (*See id.* at ¶ 21). This was not to be. Plaintiffs THA and Dauphin allege that Barlow was negligent in its work and breached its contract with THA, and that the Barlow's design flaws, unsuitable equipment, construction delays, poor project management, and lack of financial resources prevented the incinerator project from being completed.[2] (*Id.* at ¶ 17). In late fall of 2005, Barlow was increasingly behind schedule and out of money, despite having received substantially all of the contract price from THA. (*Id.* at ¶¶ 22–23). Barlow eventually obtained additional capital in the amount of $25 million from defendant CIT Capital USA, Inc. ("CIT"). (*Id.* at ¶ 24).[3]

To secure CIT's funding, a "Restated Sublicensing Agreement" replaced the original Sublicensing Agreement. (*See id.* at ¶ 26.) Via the Restated Sublicensing Agreement, Barlow Projects Harrisburg, LLC ("Barlow HBG"), the Barlow entity which had licensed the rights to the Combustion Technology from Barlow for purposes of the incinerator project, licensed that technology to THA in exchange for $25 million in fees. (*See* Defs.' Amend. Countercl. ¶¶ 19, 24–25). Barlow HBG then assigned its rights to payment from THA to a newly created Barlow entity, Aireal Technologies of Harrisburg, LLC ("Aireal"). (*Id.* at ¶ 24(b)). THA consented to this assignment. (*Id.* at ¶ 24(c)). Finally, CIT purchased Barlow HBG's interest in Aireal for $25 million. (*Id.* at ¶ 24(e)). The $25 million from CIT was used by Barlow to continue work on the incinerator project. (*Id.* at ¶ 28). As a result of these transactions, THA allegedly became obligated to pay the restated $25 million license fee to Aireal, which is now owned by CIT.

Plaintiffs allege that the Restated Sublicensing Agreement is unenforceable for lack of consideration because THA had already paid Barlow $2.7 million in full satisfaction of the original license fee six months prior to entering into the restated agreement. (Amend. Compl. ¶¶ 40, 50–51). Plaintiffs also allege that THA's entering into the Restated Sublicensing Agreement was an *ultra vires* act in violation of THA's authority and Pennsylvania's Municipal Authorities Act, 53 Pa.C.S.A. § 5601, *et seq.* in that THA agreed to pay for a license for which it had already paid in full and, effectively, agreed to guarantee the debts of its private party contractor. (*Id.* at ¶¶ 52, 70). Plaintiffs also contend

---

2. THA's claims against Barlow and other entities were the subject of another suit initiated before this Court, *The Harrisburg Authority v. Barlow Projects, Inc., et al.,* 07–cv–1520, which was ultimately settled in November 2009.

3. Plaintiffs allege that the series of agreements between THA, Barlow, and CIT, which were consummated in order to obtain this additional funding, were a veiled attempt to force THA to guarantee CIT's loan to Barlow through *ultra vires* and unenforceable contracts, and it is these contracts that Plaintiffs seek to have declared void. (*Id.* at ¶¶ 25–27).

that, pursuant to Amendment No. 9 to the Equipment Contract, Barlow and its associated entities assumed all of THA's payment obligations, and that THA's only obligation was to forward payments from Barlow to CIT. (*Id.* ¶ 57, 61).

In March 2007, THA failed to make payments to Aireal as purportedly required by the Restated Sublicensing Agreement. (Amend. Compl. ¶ 101; Amend. Countercl. ¶¶ 31, 32.) In June 2007, THA, Aireal, and CIT entered into a Forbearance Agreement, which acknowledged THA's obligations under the Restated Sublicensing Agreement. (Amend. Compl. ¶ 101.) Plaintiffs allege that the Forbearance Agreement merely repeats the void and unenforceable provisions of the Restated Sublicensing Agreement and therefore is also void and unenforceable. (*Id.* at ¶¶ 101, 103.) Upon expiration of the forbearance period in November 2007, CIT and Aireal provided notice to THA of its default under the Restated Sublicensing Agreement, gave THA the required sixty-day period to cure the default, and notified THA of their intent to seek legal remedies if the default was not cured. (*Id.* at ¶ 107, Ex. J.)

Before expiration of the sixty-day grace period, Plaintiffs THA and Dauphin filed suit, asserting two claims against CIT and Aireal: one seeking a declaratory judgment that, *inter alia*, the Restated Sublicensing Agreement is void and unenforceable, (*id.* at Counts I, III), and one seeking a permanent injunction enjoining CIT and Aireal from enforcing, *inter alia*, the Re-

stated Sublicensing Agreement (*id.* at Counts II, IV). CIT and Aireal both counterclaimed against THA for, *inter alia*, breach of the Restated Sublicensing Agreement. (Amend. Countercl., Count I–III).

## II. PROCEDURAL HISTORY

On March 30, 2009, THA filed the aforementioned Motion to Compel the Production of Documents. (Doc. 59) (the "Motion"). Through that Motion, THA sought from CIT; CIT's counsel, Moore Van Allen ("MVA"); and Aireal the production of documents listed in privilege logs that were being withheld on the basis of attorney-client privilege. THA contended that many of the descriptions in the privilege logs created by CIT and MVA were insufficiently specific and that numerous documents catalogued in the privilege logs were not subject to the attorney-client privilege. THA sought the production of all of the documents entered in the privilege logs. As an alternative to the outright production of these documents, the Motion requested that the Court conduct an *in camera* review of the same in order to assess the applicability of the asserted privilege. As a result of both the voluminous nature of the documents sought, the complexity of the dispute itself, and our overburdened caseload at the time, we lacked the judicial resources to properly resolve the dispute. Consequently, we referred it to the able hands of Magistrate Judge J. Andrew Smyser pursuant to 28 U.S.C. § 636(b)(1)(A).[4]

---

**4.** This provision states:

[A] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A) (2005).

Magistrate Judge Smyser issued an order resolving the Motion to Compel on July 14, 2009. (Doc. 78). On July 24, 2009, THA appealed from that order pursuant to Federal Rule of Civil Procedure 72(a)[5] and Middle District of Pennsylvania Local Rule 72.2[6] and filed a brief in support thereof. (Docs. 79, 80). CIT and Aireal filed an opposing brief on August 7, 2009, (Doc. 85), and THA filed a reply brief on August 18, 2009, (Doc. 86). The parties subsequently filed supplemental briefs, as requested. (*See* Docs. 90, 91, 94). Accordingly, the appeal is ripe for disposition. As a first step in resolving the appeal, we shall address the particulars of the appealed order.

## III. MAGISTRATE JUDGE SMYSER'S ORDER

As a method of resolving the aforementioned discovery dispute, Magistrate Judge Smyser ordered CIT to produce 50 of the requested documents, selected by THA, from the privilege logs with the understanding that such production would not constitute waiver of the asserted privilege.[7] This procedure failed to resolve the disputes relating to whether the descriptions in the privilege logs were accurate and whether the documents in question were in fact privileged. Accordingly, Magistrate Judge Smyser ordered letter briefs addressing these issues.

Before resolving the discovery dispute, Magistrate Judge Smyser was faced with a choice of law decision.[8] As the Magistrate Judge noted, a federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Nafar v. Hollywood Tanning Sys., Inc.*, 339 Fed.Appx. 216, 220 (3d Cir.2009) (citation omitted). As we explain below in more detail, the first step in Pennsylvania's choice of law methodology is to determine whether an "actual con-

---

**5.** This provision states, "When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must ... issue a written order stating the decision. A party may ... file objections to the order within 14 days.... The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a).

**6.** This provision states,

Any party may appeal from a magistrate judge's order determining a non-dispositive pretrial motion or matter in any civil or criminal case in which the magistrate judge is not the presiding judge of the case, within ten (10) days after issuance of the magistrate judge's order, unless a different time is prescribed by the magistrate judge or a judge.

\*   \*   \*

A judge of the court shall consider the appeal and shall set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law. The judge may also reconsider *sua sponte* any matter determined by a magistrate judge under this rule.

M.D. Pa. L.R. 72.2.

**7.** CIT complied with this order in that it produced 45 of the 50 documents to THA for review and provided the remaining documents to Magistrate Judge Smyser for *in camera* review pursuant to a safety-valve agreement reached between the parties.

**8.** THA argued that Pennsylvania law applied because a choice of law provision in the Restated Sublicensing Agreement, upon which CIT bases its counterclaims, states, "This Agreement shall be governed by and construed in accordance with the laws of Pennsylvania without regard to its principles of conflicts of laws." (Doc. 1–6 p. 34 ¶ 17); (Doc. 78 p. 7, n. 2). On the other hand, CIT argued that New York law applied because that was the location of CIT's headquarters and of the majority of its employees who were engaged in its legal discussions. (Doc. 79 p. 5, n. 3).

flict" exists. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir.2007). Magistrate Judge Smyser correctly noted that "[i]f two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." *Id.*[9] Accordingly, the Magistrate Judge proceeded to identify the contours of the attorney-client privilege law in Pennsylvania and New York.

In doing so, the Magistrate Judge noted that while the attorney-client privilege was codified in Pennsylvania,[10] that statute had not been interpreted uniformly. To wit, one line of cases makes no distinction between a communication from an attorney to a client and a communication from a client to an attorney. *See, e.g., In re Ford Motor Co.*, 110 F.3d 954, 965 n. 9 (3d Cir.1997) ("[T]he entire discussion between a client and an attorney undertaken to secure legal advice is privileged, no matter whether the client or the attorney is speaking."). The other line of cases generally extends the privilege solely to confidential communications from a

client to an attorney. *Nationwide Mut. Ins. Co. v. Fleming*, 924 A.2d 1259, 1264 (Pa.Super.Ct.2007) (citations omitted) ("*Nationwide I*").[11] A corollary to this interpretation extends the privilege to communications from an attorney to a client only to the extent that the communication contains, and would thus reveal, confidential communications from a client. *See id.* Magistrate Judge Smyser interpreted Pennsylvania law in accord with the first line of cases, holding that it was the better reasoned view, *see* 1 K. BROUN, MCCORMICK ON EVIDENCE § 89 (6th ed. 2006), and that courts have continually looked to common law to supplement gaps found in the attorney-client privilege provision, *see Law Office of Douglas T. Harris, Esq. v. Philadelphia Waterfront Partners, LLC*, 957 A.2d 1223, 1230 (Pa.Super.Ct.2008).

The Magistrate Judge then recognized that the New York attorney client privilege was also codified, and imparts the privilege to any confidential communica-

9. In such a situation, courts are directed to apply the law of the forum state. *See State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 Fed.Appx. 182, 186 n. 1 (3d Cir.2006) (citations omitted).

10. "In a civil matter, counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5928 (" § 5928").

11. This opinion was appealed to the Pennsylvania Supreme Court, which granted allocatur to resolve the following question:

Whether the Superior Court erred as a matter of law in holding that the attorney-client privilege did not apply to a confidential memorandum written by [appellants]' in-house senior counsel to its senior executives and attorneys which related to pending and future litigation and reflects confidential in-

formation previously shared by the client with the attorney, as well as the attorney's legal advice?

*Nationwide Mut. Ins. Co. v. Fleming*, 992 A.2d 65, 67 (Pa.2010) ("*Nationwide II*"). The Pennsylvania Supreme Court was equally divided on the issue (Justices Eakin and Baer supported affirmance, Justices Saylor and Castille supported reversal, and Justices Todd and McCaffery did not participate) and consequently affirmed the Superior Court's decision. However, the opinion in support of affirmance was predicated upon issues of waiver and therefore did not address the merits of the appeal. *See id.* at 70 (even if the attorney-client privilege was applicable to the documents at issue, the disclosure of the documents waived that privilege). Accordingly, we are left without any definitive pronouncement from the Pennsylvania Supreme Court that would govern the issue presently before us, *i.e.*, whether the Pennsylvania attorney-client privilege should generally extend, as a matter of law, to communications from an attorney to a client.

tion between the attorney and client. *See Spectrum Sys. Int'l Corp. v. Chemical Bank*, 78 N.Y.2d 371, 575 N.Y.S.2d 809, 581 N.E.2d 1055, 1060 (1991) (citing New York Evidence Law § 4503(a)). Magistrate Judge Smyser then noted, "Although typically arising in the context of a client's communication to an attorney, the privilege extends as well to communications from attorney to client." *Id.* "In order for the privilege to apply, the communication ... must be made for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." *Id.* (internal quotations omitted) (citation omitted).

In light of the foregoing, Magistrate Judge Smyser concluded that there was "no conflict" between the attorney-client privilege law of Pennsylvania and New York, and therefore applied the law of Pennsylvania, as represented in cases such as *Ford Motors*. After applying this law to the 50 documents submitted to him, Magistrate Judge Smyser concluded that only one document was not privileged. Accordingly, he ordered this document to be produced. This, combined with CIT's voluntarily withdrawal of the claim of privilege as to seven additional documents, which were also produced, led the Magistrate Judge to question whether there were additional documents listed in the privilege logs to which the privilege did not properly apply. Accordingly, CIT was ordered to review each of the documents listed in the privilege logs to determine whether the attorney-client privilege actually prevented their disclosure.

THA appealed this decision, asserting that Magistrate Judge Smyser failed to correctly apply Pennsylvania attorney-client privilege law, as articulated in cases such as *Nationwide I*. As noted above, we analyze the Magistrate Judge's order for clear error. M.D. Pa. L.R. 72.2. In doing so, we may reconsider *sua sponte* any matter determined by Magistrate Judge Smyser. *Id.*

## IV. DISCUSSION

As aforestated, the initial step in making a choice of law determination requires us to assess whether an actual conflict between the laws of Pennsylvania and New York exists. In order to do this, we must first identify the applicable law in Pennsylvania and New York.

To this end, we again note that Pennsylvania's attorney-client privilege law, as codified, states, "In a civil matter, *counsel shall not be competent or permitted to testify to confidential communications made to him by his client,* nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5928 (emphasis added). Based upon the plain language of this statute, it would appear that Pennsylvania law generally extends its attorney client-privilege only to communications from a client to an attorney. Many courts in the Commonwealth of Pennsylvania have adopted this construction of the attorney-client privilege. *See, e.g., Commonwealth v. Maguigan*, 511 Pa. 112, 511 A.2d 1327, 1333–34 (1986); *Slater v. Rimar, Inc.*, 462 Pa. 138, 338 A.2d 584, 589 (1975); *Berkeyheiser v. A–Plus Investigations, Inc.*, 936 A.2d 1117, 1126 (Pa.Super.Ct.2007) (quoting *Gocial v. Independence Blue Cross*, 827 A.2d 1216, 1222 (Pa.Super.Ct.2003)); *Birth Center v. St. Paul Cos., Inc.*, 727 A.2d 1144, 1164 (Pa.Super.Ct.1999); *Brennan v. Brennan*, 281 Pa.Super. 362, 422 A.2d 510, 514 (1980); *see also Coregis Ins. Co. v. Law Offices of Carole F. Kafrissen, P.C.*, 186 F.Supp.2d 567, 573 (E.D.Pa.2002); *Garvey v. Nat'l Grange Mut. Ins. Co.*, 167 F.R.D. 391, 395 (E.D.Pa.1996) (quoting *In re*

*Westinghouse Elec. Corp.*, 76 F.R.D. 47, 56 (W.D.Pa.1977)).[12]

In stark contrast to this interpretation of § 5928 stands the line of cases represented by *Ford Motors*, which guided the decision of Magistrate Judge Smyser in the case at bar. As indicated above, these cases hold that any communication between an attorney and his client undertaken for the purpose of seeking or dispensing legal advice is privileged regardless of the identity of the speaker. *See, e.g., Ford Motors*, 110 F.3d at 965 n. 9 (citing RESTATEMENT OF LAW GOVERNING LAWYERS §§ 118, 120 (1996 proposed final draft)). For the following reasons, we do not believe that this construction of § 5928 comports with the underlying purpose of the attorney-client privilege.

■ "It is well established that evidentiary privileges … are generally disfavored and should be narrowly construed." *Pennsylvania Depart. of Transp. v. Taylor*, 576 Pa. 622, 841 A.2d 108, 118 (2004) (Nigro, J. dissenting) (citing *Commonwealth v. Stewart*, 547 Pa. 277, 690 A.2d 195, 197 (1997)). The attorney client privilege is one such evidentiary privilege. *See Fisher v. United States*, 425 U.S. 391, 401, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The purpose of the privilege has been articulated as follows:

> The attorney-client privilege is intended to foster candid communications between legal counsel and the client so that counsel can provide legal advice based upon the most complete information possible from the client. The historical concern has been that, absent the

attorney-client privilege, the client may be reluctant to fully disclose all the facts necessary to obtain informed legal advice if these facts may later be exposed to public scrutiny.

*Joe v. Prison Health Servs.*, 782 A.2d 24, 31 (Pa.Commw.Ct.2001) (citing *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406 (1999) (internal citations omitted)). Construction of this privilege in the manner prescribed by *Ford Motors* improperly broadens the scope of the privilege in a way that is inconsistent with its purpose. To wit, it would extend the protection of the attorney-client privilege to communications from an attorney to a client that reveal information obtained from third persons despite the fact that the communication in no way implicates the trust that the client has in his attorney. The following hypothetical will illustrate our rationale.

Suppose plaintiff and defendant are involved in an automobile accident at an intersection. Plaintiff sues for negligence. After litigation commences, a pedestrian who witnessed the accident calls defense counsel and informs him that the defendant appeared to be sending a text message on his cell phone when the accident occurred. Defense counsel emails the defendant, asking him whether the pedestrian's allegation is correct. Defendant replies in the negative. During the discovery process, plaintiff's counsel requests all documents pertaining to third party accounts of the accident. Defense counsel withholds his email to the defen-

---

12. As previously stated, Pennsylvania courts adhering to the aforementioned construction of § 5928 have supplemented that provision by extending its protections to include communications from the attorney to the client made in the course of seeking legal advice insofar as they would reveal protected communications from the client to the attorney,

*see Santer v. Teachers Ins. & Annuity Ass'n*, 2008 WL 821060 *1 (E.D.Pa.2008) (citing *Coregis*, 186 F.Supp.2d at 571–72); *Garvey*, 167 F.R.D. at 395 (quoting *In re Westinghouse Elec. Corp.*, 76 F.R.D. at 56) (citing *Truck Ins. Exchange v. St. Paul Fire & Marine Ins. Co.*, 66 F.R.D. 129 (E.D.Pa.1975)).

dant based upon both the work-product doctrine and the attorney-client privilege.[13]

Under the construction of § 5928 adopted by *Ford Motors*, this document would be privileged because it was a communication between the client and the attorney and it was made for the purpose of securing legal advice, as it was highly relevant to any potential defenses posited by our hypothetical defendant. However, we strain to identify how the protection of this document furthers the purposes undergirding the attorney-client privilege. Indeed, the communication between defense counsel and the defendant does not reveal any confidence communicated by the client to the attorney; rather, the only communication revealed by the e-mail is that between defense counsel and the third-party pedestrian. In such a case, it is difficult to comprehend how the extension of the attorney-client privilege to include this communication facilitates candid communications between legal counsel and client. After all, since the communication does not reveal any client confidences, the revelation of the communication would not appreciably affect the level of trust the client has in his attorney. Accordingly, we do not believe that the construction of § 5928 as adopted in *Ford Motors* fully comports with the purpose of the attorney-client privilege, as articulated by Pennsylvania courts. Given the narrow manner in which evidentiary privileges are to be construed, without specific instructions from the Pennsylvania General Assembly or the Pennsylvania Supreme Court, we decline any invitation to extend the attorney-client privilege beyond the scope that its purpose is designed to achieve.

■ On the other hand, we believe that the line of cases represented by *Nationwide I* sets forth the correct statement of Pennsylvania attorney-client privilege law. This determination is based upon the fact that, unlike the statement of law contained in the line of cases represented by *Ford Motors*, as a general rule the *Nationwide I* line of cases extends the privilege only to communications from the client to the attorney. In this vein, it more closely comports to the language of § 5928 than does the statement of law contained in *Ford Motors*. Further, although a corollary to the *Nationwide I* line of cases extends the privilege to certain communications from an attorney to a client, in restricting such protection to situations in which the attorney-to-client communication would reveal a client confidence, the narrow scope of the corollary ensures that the privilege is not extended to communications that do not implicate the trust a client has in his attorney.

In light of the foregoing, we believe that the correct statement of Pennsylvania attorney-client privilege law is found in cases represented by *Nationwide I* and not by the line of cases represented by *Ford Motors*.[14] Consequently, we believe that

---

**13.** While the email may very well be privileged under Pennsylvania's attorney work product doctrine, *see* Pa. R. Civ. P. 4003.3 ("... discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories"), that privilege is not implicated in the case at bar. Consequently, the subsequent discussion shall focus on the ap-plicability of the attorney-client privilege to the situation posed in our hypothetical.

**14.** As one of our colleagues in the Eastern District of Pennsylvania noted, it is not at all clear that the language in footnote 9 of *Ford Motors* has precedential value, as it appears to be *dicta*. *Coregis*, 186 F.Supp.2d at 573–74 (Robreno, J.). To the extent that the Third Circuit intended for the dictate set forth in footnote 9 to have precedential value, for the

Magistrate Judge Smyser erred in utilizing the dictates of *Ford Motors* during his choice-of-law analysis. Accordingly, we shall conduct a *de novo* choice-of-law analysis using the Pennsylvania attorney-client privilege law articulated in *Nationwide I*.[15]

■ With this in mind, and with an eye towards determining whether or not a conflict exists between Pennsylvania and New York law, we note that THA does not argue that the Magistrate Judge's construction of New York law was erroneous, and our independent review of New York law does not reveal the same. *See, e.g., Delta Fin. Corp. v. Morrison*, 15 Misc.3d 308, 829 N.Y.S.2d 877, 885 (N.Y.Sup.Ct. 2007); *see also Charter One Bank, F.S.B. v. Midtown Rochester, LLC*, 191 Misc.2d 154, 738 N.Y.S.2d 179, 189 (N.Y.Sup.Ct. 2002). As afore-referenced, New York law

extends the attorney-client privilege to *any* communication from an attorney to a client so long as it was made with the purpose of seeking legal advice. *See id.* ("Although typically arising in the context of a client's communication to an attorney, the privilege extends as well to communications from attorney to client."). Thus, it is beyond peradventure that differences between the laws of Pennsylvania and New York exist.

■ In situations such as this, courts are instructed to conduct an "interest analysis" to determine which states actually have an interest in the outcome of the dispute. *See Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966). In making this determination, we must first identify the relevant contacts that each state has with the instant dispute.[16] Then we must

---

reasons articulated above we follow Judge Robreno's lead in respectfully suggesting a change of course. *See id.* (quoting *Carver v. Foerster*, 102 F.3d 96, 106 (3d Cir.1996) (Becker, J., concurring) (noting that inferior courts may express their opinion that a higher court "has gone down a dangerous path and ought to reconsider")).

**15.** Hereafter, any references to "Pennsylvania law" or "Pennsylvania attorney client privilege law" shall refer to the rule announced in the line of cases represented by *Nationwide I*.

**16.** Contacts are only relevant "if they relate to the policies and interests underlying the *particular issue* before the court." *Racicot v. Erie Ins. Exchange*, 881 A.2d 871, 874 (Pa.Super.Ct.2005) (citing *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 856 (1970) (emphasis added)). Thus, we believe that contrary to THA's contention, Pennsylvania's choice of law methodology focuses not on the policies/interests related to the litigation as a whole, but rather on the policies/interests related to the particular dispute that is the subject of the choice of law analysis. We realize that this conclusion opens the door to the possibility that laws of different states could govern different issues in the same litigation, a concept known as *"depecage." See Taylor v. Mooney Aircraft Corp.*, 265 Fed.Appx. 87, 92–

93 (3d Cir.2008). While Pennsylvania state courts have not explicitly addressed the issue of *depecage*, the Third Circuit has predicted that Pennsylvania would adopt it. *See id.* at 91 (citations omitted). The Third Circuit's conclusion is based upon a pronouncement of the Pennsylvania Supreme Court to the effect that Pennsylvania's choice of law analysis focuses on "the policies and interests underlying the *particular issue* before the court." *See id.* (quoting *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796, 805 (1964) (emphasis added)). We believe that this rationale supports our interpretation of *Racicot*.

At this juncture, we note that THA cites *Carbis Walker LLP v. Hill, Barth & King, LLC*, 930 A.2d 573 (Pa.Super.Ct.2007), as authority standing in direct opposition to the foregoing conclusion. For the following reasons, we reject THA's contention. *Carbis* involved a discovery dispute relating to the inadvertent disclosure of an allegedly privileged document from defense counsel in Ohio to plaintiff's counsel in Pennsylvania. In determining the jurisdiction that would provide the applicable law, the *Carbis* Court took cognizance of the following contacts: (i) the underlying lawsuit arose out of an individual's employment in the Pennsylvania offices of both the plaintiff and the defendant; (ii) the inadvertent disclosure was made to plaintiff's

determine whether the policies undergirding the law in each jurisdiction implicate the contacts in that jurisdiction. Based upon this assessment, we must classify the conflict as "true," "false," or "unprovided-for" and apply the law associated with the relevant classification. *See Hammersmith*, 480 F.3d at 230.[17]

As far as we can tell, the relevant contacts with each state comprise the following. With regard to the forum state of Pennsylvania, its relevant contacts include: (i) it is the domicile of THA; (ii) it is the domicile of Dauphin; (iii) it is the place where the underlying litigation is centered; (iv) it was the location of THA's attorneys; and (v) the Sublicensing Agreement included a choice of law provision mandating application of its law. With regard to the state of New York, its relevant contacts are as follows: (i) CIT's headquarters are there; (ii) it is the location of the CIT division responsible for the underlying transaction in this case; (iii) all communications identified in the privilege logs at issue occurred between CIT employees and attorneys located primarily in New York;[18] and (iv) almost all of the CIT employees receiving legal advice were located in New York. Having identified the

counsel in Pennsylvania, although it was originally intended to be transmitted to an office of defendant's counsel in Pennsylvania; and (iii) the subject matter of the document related to the underlying litigation that was commenced in Pennsylvania. Accordingly, while the *Carbis* Court noted the contacts between Pennsylvania/Ohio and the litigation as whole, the same was merely one factor in a multi-factored analysis that focused on the contacts between Pennsylvania/Ohio and the allegedly privileged document, *i.e.*, the subject of the particular issue in dispute. Indeed, the scope of the court's analysis is confirmed by its recognition that Pennsylvania, not Ohio, had superior contacts to the "underlying issue" before it. *See id.* at 581. The use of this phrase indicates that, as articulated above, Pennsylvania's choice-of-law methodology is in fact focused on a state's relevant contacts with the particular dispute at issue, and not on a state's relevant contacts with the litigation as a whole. To the extent that the *Carbis* Court instructs courts to apply "the policy of the jurisdiction most intimately concerned with the outcome of [the] *particular litigation*," *id.* at 578 (emphasis added), we construe the phrase "particular litigation" to refer not to the general litigation forming the foundation of the case as a whole, but rather to the discrete issues involved in the particular choice-of-law litigation. Accordingly, we do not believe that *Carbis* stands in opposition to our interpretation of *Racicot*.

Since the communications in our case do not have as extensive a connection with Pennsylvania as the communication in *Carbis* (*i.e.*, in our case the transmission of the communi-

cation to Pennsylvania never occurred and was never intended) we do not believe that the dictates of *Carbis* compel us to apply Pennsylvania law to the dispute *sub judice*.

17. A "true conflict" exists "when the governmental interests of both jurisdictions would be impaired if their laws were not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991). In these cases, courts are instructed to apply "the law of the state having the most significant contacts or relationships with the particular issue." *In re Estate of Agostini*, 311 Pa.Super. 233, 457 A.2d 861, 871 (1983). A "false conflict" arises when "only one jurisdictions's governmental interests would be impaired by the application of the other jurisdiction's law." *Lacey*, 932 F.2d at 187. In cases involving false conflicts, courts are to apply the law of the only interested jurisdiction. *Id.* Finally, in cases where neither jurisdictions's interests would be impaired by the application of the other jurisdiction's law, an "unprovided-for" case exists and the court is instructed to apply the law of the forum. *3039 B St. Assocs., Inc. v. Lexington Ins. Co.*, —— F.Supp.2d ——, ——, 2010 WL 1802045 *3 (E.D.Pa.2010).

18. One attorney was allegedly located in Toronto, Ontario, Canada. (Doc. 91 p. 13). There are other indications that a few attorneys were in North Carolina. Regardless, CIT claims, and THA does not appear to dispute, that the majority of the attorneys were located in New York and that not a single communication claimed as privilege occurred with anyone in Pennsylvania.

relevant contacts, we must now determine whether the policies undergirding the laws in New York and Pennsylvania implicate the contacts found in those jurisdictions.

The purpose of New York's attorney-client privilege law is to facilitate competent and effective legal representation in New York. *See United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir.1997). The privilege accomplishes this objective by ensuring that New Yorkers seeking legal advice will be able to fully confide in their attorneys, secure in the knowledge that their confidences will not be publicly exposed. *See Goldberg v. Hirschberg*, 10 Misc.3d 292, 806 N.Y.S.2d 333, 335 (N.Y.Sup.Ct. 2005) (quoting *Priest v. Hennessy*, 51 N.Y.2d 62, 431 N.Y.S.2d 511, 409 N.E.2d 983 (1980)). In our opinion, the policies undergirding New York's attorney-client privilege law are directly implicated by the issue *sub judice*. Indeed, CIT is headquartered in New York and almost all of the employees receiving legal advice reside there. Further, at a minimum a substantial majority of the communications at issue in this case occurred in New York. Consequently, since the instant dispute involves a New York litigant seeking to protect primarily New York-based communications, we believe that it is beyond question that the state of New York has an interest in applying its attorney-client privilege law to the dispute. Having made this determination, we turn our attention to analyzing Pennsylvania's interest.

As aforestated, the purpose of Pennsylvania's attorney client privilege law is to facilitate in Pennsylvania competent and effective legal representation, which is based in part on candid communications between client and attorney. *See Joe v. Prison Health Servs.*, 782 A.2d at 31 (citations omitted). The privilege encourages Pennsylvania clients to be open and honest in their communications with their attorneys by assuring them that their confidences will be kept secret. *See id.* (citations omitted). We thus believe that the policies underlying Pennsylvania's attorney-client privilege law indicate that Pennsylvania has no interest in having that law applied to the issue at bar. Indeed, neither the attorneys (MVA) nor client (CIT) implicated in the instant privilege dispute are located in Pennsylvania. Further, there is no indication that the MVA–CIT relationship arose in Pennsylvania. Thus there are no Pennsylvania litigants seeking protection of the attorney-client privilege, meaning that application of New York's law would not impair Pennsylvania's interest in protecting its litigants.

Given the foregoing, we believe that the conflict present in this case is properly classified as a "false conflict," since New York is the only jurisdiction with an actual interest in the outcome of the dispute. *See Lacey*, 932 F.2d at 187 (a "false conflict" arises when "only one jurisdictions's governmental interests would be impaired by the application of the other jurisdiction's law."). Accordingly, it is our opinion that the law of the state of New York should be used to resolve the issue before us. *See id.* (in cases involving false conflicts, courts are to apply the law of the only interested jurisdiction).

At this juncture, we note that this conclusion is not altered by our recognition that the Sublicensing Agreement contains a provision that states, "This Agreement shall be governed by and construed in accordance with the laws of Pennsylvania without regard to its principles of conflicts of laws." (Doc. 1–6 p. 34 ¶ 17). While we do not deny THA's assertion that this choice-of-law provision should be given effect in certain circumstances, *see Educ.*

*Res. Inst., Inc. v. Cole,* 827 A.2d 493, 498–99 (Pa.Super.Ct.2003) (In Pennsylvania, "[c]hoice of law provisions in contracts will generally be given effect."), we do not agree with its contention that the scope of the provision encompasses the instant privilege dispute. Indeed, the provision only establishes that Pennsylvania law shall apply to legal issues related to the Sublicensing Agreement; it notably does not establish the applicability of Pennsylvania law to issues *collateral* to the contract.

The issue presently before us *does not* involve any dispute involving the benefits received from, or the obligations imposed by, the provisions of the Sublicensing Agreement; rather, the dispute *sub judice* relates to issues of discovery and privilege. Consequently, we believe that the issue at bar is *collateral* to the contract and the choice-of-law provision contained therein. This determination, combined with our aforestated conclusion that New York is more intimately associated with the privilege dispute than is Pennsylvania, reaffirms our conclusion that New York law should apply to the privilege dispute at issue in this case. *See ICI Americas Inc. v. John Wanamaker of Philadelphia,* 1989 WL 38647 *2 (E.D.Pa.1989) ("Although the contract at issue includes a choice of law provision requiring questions under the contract to be governed by California law, the scope of attorney-client privilege is *collateral* to the contract and concerns issues of discovery, evidence, and privilege more associated with Pennsylvania civil practice than California contract law.") (emphasis added).

THA cites *Huber v. Taylor,* 469 F.3d 67, 80 (3d Cir.2006), to support its assertion that choice-of-law provisions are given effect even when not litigating the provisions of the contract. The relevant language in *Huber* is as follows: "Plaintiffs are not in fact litigating the provisions of the contract in this action. Nonetheless, the fiduciary duty at issue arose under the contracts. It follows then that the duty created by the contracts should be enforced under the law chosen as applicable by the contracts." *Id.* Thus, *Huber* does not stand for the proposition that a choice-of-law provision contained in a contract that forms the basis of a plaintiff's claims should be given effect in resolving *all issues* that may arise throughout the case. Rather, *Huber* stands for the proposition that such a provision should be given effect when resolving *issues related to the contract.* As stated above, the attorney-client privilege issue presently before us has no relation to the contract containing the choice-of-law provision. Therefore, the dictates of *Huber* do not alter the foregoing determination.

■ Further, our decision to apply New York attorney-client privilege law in the case at bar is not altered by THA's appeal to the dictates of Restatement (Second) of Conflicts of Law § 139 ("§ 139"). While Pennsylvania has adopted the general principles contained in the Restatement in aid of resolving conflict of laws questions, *see Elston v. Indus. Lift Truck Co.,* 420 Pa. 97, 216 A.2d 318, 322 (1966) ("[T]o the extent that the Restatement suggests that *the conflict be resolved by analysis rather than by resort to a mechanical rule,* we adopt its treatment of the problem.") ("emphasis added"), THA provides us with absolutely no support for the proposition that Pennsylvania has adopted § 139. Indeed, only *one* court in Pennsylvania has cited that provision. *See Talcott, Inc. v. C.I.T. Corp.,* 14 Pa. D. & C.3d 204, 205–06 (Pa. Com.Pl.1980). Nevertheless, we shall ad-

dress the merits of this argument out of an abundance of caution.

The Restatement states:

> Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted *unless* there is some special reason why the forum policy favoring admission should not be given effect.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 139(2) (1971) (emphasis added). Among the factors to be considered in making this determination are: "(i) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved,[19] (ii) the relative materiality of the evidence that is sought to be excluded,[20] (iii) the kind of privilege involved,[21] and (iv) fairness to the parties."[22] RESTATEMENT (SECOND) OF CONFLICTS OF LAW, Comment on § 139(2).

As discussed above, we believe that the state of Pennsylvania has no interest in applying its law to the attorney-client privilege dispute at issue in this case. Rather, we have determined that the state of New York, the jurisdiction in which a majority of the communicants resided and the communications at issue were made, had a paramount interest in applying its own law to the dispute. In light of New York's superior contacts, we believe that CIT *probably* would have consulted New York law to resolve any attorney-client disputes related to the communications at issue.[23] We believe that these determinations are extraordinary enough to forego the application of Pennsylvania law in favor of New York law. The fact that the New York's attorney-client privilege law is well-established only buttresses this determination. *See Spectrum*, 575 N.Y.S.2d 809, 581 N.E.2d at 1059 ("The attorney-client privilege [is] the oldest among common-law evidentiary privileges.") (citations omitted). Accordingly, we believe that even if § 139 had vitality in Pennsylvania, "special reasons" support the application of New York law to the privilege dispute at issue in this case.

As previously discussed, New York attorney-client privilege law is identical to the Pennsylvania law represented in the *Ford Motors* line of cases. Consequently, inasmuch as Magistrate Judge Smyser

---

19. "If the contacts with the state of the forum are numerous and important, the forum will be more reluctant to give effect to the foreign privilege and to exclude the evidence than it would be in a case where the contacts are few and insignificant." RESTATEMENT (SECOND) OF CONFLICTS OF LAW, Comment on § 139(2).

20. "The forum will be more inclined to give effect to the foreign privilege and to exclude the evidence if the facts that would be established by this evidence would be unlikely to affect the result of the case or could be proved in some other way." *Id.*

21. "[T]he forum will be more inclined to give effect to a foreign privilege that is well established and recognized in many states than to a privilege that is relatively novel and recognized in only a few states." *Id.*

22. "The forum will be more inclined to give effect to a privilege if it was probably relied upon by the parties." *Id.*

23. While THA correctly points out that there is no evidence to corroborate this assertion, there is also no evidence that CIT did not rely on New York law. Further, as noted above, CIT has sufficiently established that New York, and not Pennsylvania, had superior contacts with the dispute at bar. Given this intimate connection, we believe that CIT *probably* would have relied on New York law to resolve any privilege disputes. *See id.* ("The forum will be more inclined to give effect to a privilege if it was *probably* relied upon by the parties.") (emphasis added).

mistakenly applied the dictates of *Ford Motors* to the issues at bar, he essentially applied the New York law that we have determined is controlling. For the most part, THA does not argue that Magistrate Judge Smyser misapplied the attorney-client privilege law principles contained in *Ford Motors*/New York law.[24] After reviewing Magistrate Judge Smyser's order, we do not perceive that he committed any error of law in applying *Ford Motors*/New York law to the issues before him. Accordingly, we are confident that if Magistrate Judge Smyser had employed the New York law we deem controlling, he would have reached the same conclusions as those articulated in his July 14, 2009 order.[25] Consequently, although we have taken a more circuitous route than that employed by the Magistrate Judge, we shall affirm his order and deny the instant appeal in its entirety.[26]

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1) Magistrate Judge Smyser's July 14, 2009 order (Doc. 78) is **AFFIRMED** on other grounds.

---

**24.** Rather, THA's objection is largely focused on the erroneous determination that the *Ford Motors* line of cases accurately represented Pennsylvania's prevailing attorney-client privilege law. The only objection THA raises with regard to the misapplication of *Ford Motors* centers around the burden associated with asserting the attorney-client privilege. As THA notes, it is well-established that "the party who has asserted the attorney-client privilege must initially set out facts showing that the privilege has been properly invoked." *Carbis*, 930 A.2d at 581 (citations omitted). THA notes that in spite of Magistrate Judge Smyser's recognition that a "number of the descriptions on the privilege logs when applied to a particular communication are inaccurate," (Doc. 78 p. 15), he refused to conclude that CIT failed to establish that the privilege was properly invoked. THA asserts that this failure constitutes an error of law.

However, as Magistrate Judge Smyser noted, "in many cases the particular communication at issue is part of a more extended conversation. When viewed in context of the entire conversation, we conclude that the descriptions on the privilege log are adequate." (Doc. 78). We believe that Magistrate Judge Smyser's focus on the "larger conversation," rather than the "particular communication" was appropriate since most of the communications at issue occurred through email correspondence. In the electronic age, entire conversations that were once conducted in-person or over the telephone are often conducted through the exchange of numerous e-mails between the communicants. In this electronic format, each email represents the communicants' opportunity to voice their opinion, *i.e.*, their "turn" to speak. In attempting to describe an in-person conversation, one would not focus on the details or subject of particular, discrete components of that conversation; rather, one would focus on the general subject or theme of the overall conversation. We believe the same holds true for electronic conversations. In describing the same, we think it entirely reasonable that CIT focus on the overall subject of the e-mail conversation rather than on the subject of each individual e-mail correspondence. Consequently, we do not believe that the Magistrate Judge committed an error of law in basing his determination that CIT carried its burden on the fact that the descriptions on the privilege log, while inaccurate with regard to particular communications, were accurate when viewed in the context of the overall e-mail conversation.

**25.** Accordingly, we believe that Magistrate Judge Smyser's application of *Ford Motors*, instead of *Nationwide*, in his choice-of-law analysis constituted harmless error.

**26.** We note that THA asserts that CIT's own admission that the attorney-client privilege did not apply to 6 of the 50 allegedly privileged documents produced in connection with this dispute renders irrational Magistrate Judge Smyser's decision to afford CIT an opportunity to re-review the allegedly privileged documents in order to assess whether the privilege actually applies. However, THA has provided no authority to support its assertion that this decision should be reconsidered, and we can perceive no reason to do so. Indeed, now that the contours of the applicable attorney-client privilege, which were previously unknown to CIT, have been established, it is presently in the best position to assess wheth-

2) THA's appeal of Magistrate Judge Smyser's July 14, 2009 order (Doc. 78) is **DENIED.**

er the documents at issue are protected by the privilege.